The Honorable Robert S. Lasnik

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>JAQUAN JACKSON,<br><br>Defendant. | NO. CR22-037 RSL<br>         CR20-096 RSL<br><br>GOVERNMENT'S SENTENCING MEMORANDUM<br><br>Sentencing: June 15, 2023 at 9:00 a.m. |

Jaquan Jackson has steadfastly eroded the trust of Probation, the government, and the Court. The collective impact of his outright lies, concealment of material facts, inconsistencies, and misrepresentations is staggering. Over a two-year period between December 2019 and February 2022, Jackson:

- lied to his Department of Corrections Officer about where he was living;

- lied to several girlfriends about whether he was dating other women;

- persuaded at least one girlfriend (Sheree Gradney), possibly three (Brittney McClain and Schama Lynce), to lie about events related to his possession of a firearm (Dkt. 28, Ex. 2-4);

- made numerous excuses for missing drug tests and not responding to Probation (Dkt. 74, 77);

Government's Sentencing Memorandum - 1
United States v. Jackson  / CR22-037 & CR20-096

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- lied ("adamantly") to Probation about whether he used alcohol (Dkt. 73, 75);

- drove with a suspended license and failed to report a law enforcement contact to Probation (Dkt. 76)

- allegedly threatened a woman with a firearm (Dkt. 28, Ex. 6);

- dated a woman who was not his fiancée and took this woman to his mother's birthday party on a Thursday evening while his daughter spent the night with a friend (his fiancée's whereabouts that night are unknown) (Dkt. 28, Ex. 7, 8);

- took shots of alcohol at the aforementioned party (Dkt. 28, Ex. 8);

- drove with a suspended license and without an ignition interlock device (Dkt. 28, Ex. 8);

- crashed his car on a highway and then switched seats with his injured, barely conscious passenger to make it look like she was driving (Dkt. 28, Ex. 8); and

- lied to Probation about whether he had a car (Dkt. 77).

Jackson's instinct to lie and cover his tracks rather than modify his behavior is a significant barrier to his progress. Honesty and effort are the engines of supervised release. Perhaps more importantly, they are the foundation of the new life Jackson claims he wants to build for himself and his daughter. Accountability is essential to convince Jackson that he must make significant changes. If there are no consequences for breaching the Court's trust, then there is every reason for Jackson to continue concealing problematic conduct and no reason for him to make different choices.

This is Jackson's third federal charge of being a felon in possession of a firearm, and the second time he has violated federal supervised release by possessing a firearm. Since his first conviction in 2010, he has not been able to live in the community for a full

Government's Sentencing Memorandum - 2
United States v. Jackson / CR22-037 & CR20-096

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

year without committing a new crime. *See* PSR ¶¶ 23-34. His criminal history is rife with Probation violations and revocations. PSR ¶¶ 27, 28, 33, 34.

Two years ago, the Court, Probation, the government, and the defense all endorsed an unusual resolution that allowed Jackson a chance to rehabilitate in the community and preserve his relationship with his daughter. *See* CR20-096 RSL. Unfortunately, he squandered that opportunity. The government made the best sentencing recommendation it could with the information we possessed at the time, and the worst possible recommendation in retrospect. While Jackson was out of custody, under supervision with access to significant treatment resources, Jackson endangered the community by drinking alcohol, driving with a suspended license and without an ignition interlock device, and possessing a firearm. Far worse, Jackson's choices placed his daughter's well-being at risk. Jackson's numerous probation violations show that February 4 was not an isolated incident. Only Jackson knows how many times he drank alcohol around his daughter, and in what context.

As Probation noted, public safety is a significant consideration here. *See* Probation Sentencing Recommendation at 3-4. Jackson needs more time to mature, address his counterproductive thinking patterns, and work through numerous issues before he can be safely reintroduced into the community. He must also be held accountable for the seriousness of his offense, which is intensified by his breach of the Court's trust.

The government recommends a total sentence of 60 months in custody, to be followed by three years of supervised release. This sentencing recommendation considers the aggravating factor that Jackson committed this offense on supervised release. In the related supervised release matter (CR20-096 RSL), the government recommends that the Court impose a sentence of 24 months in custody, concurrent to the sentence imposed for the new case (CR22-037 RSL), and terminate supervision.

The government's total recommended sentence of 60 months is the same as Probation's total recommended sentence. The only difference is that Probation

Government's Sentencing Memorandum - 3
*United States v. Jackson* / CR22-037 & CR20-096

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

recommends a sentence of 42 months in custody for the new case, and an additional 18 months in custody (consecutive) for the supervised release violations.

## I. BACKGROUND

*Jackson's Performance on Supervised Release 2021-2022*

Jackson's term of supervised release began May 4, 2021. Between May 2021 and January 2022, Probation alleged a total of 10 supervised release violations in five different petitions but recommended no further action as to all of them. *See* Dkt. 73, 74, 75, 76, 77. In May 2021, Jackson repeatedly denied alcohol consumption before eventually admitting the violation. Dkt. 73. In June and July 2021, Jackson asked to be excused from urinalysis testing because he was exposed to COVID-19, but he also failed to provide medical verification of the exposure. Dkt. 74. Twice, he did not report to the Probation Office as directed and claimed that his cell phone was stolen. *Id.* Later that month, he had another positive urinalysis test, adamantly denied consuming alcohol, and then later admitted consuming alcohol. Dkt. 75.

In September 2021, a woman called 911 to report that Jackson pulled a gun out of a black fanny pack and threatened to pistol whip her with it, before going to his job at the YMCA. Dkt. 28, Ex. 6. Neither the Seattle Police Department, nor Probation, nor the government were able to locate the woman to interview her. Based on the inability to investigate or corroborate the 911 call, neither Probation nor the government took further action on the incident.

Also in September 2021, Jackson was cited for driving with a suspended license and did not report the law enforcement contact to Probation. Dkt. 76. Probation contacted Jackson's treatment provider, who noted that Jackson was out of compliance for failing to attend group sessions and participate in sober support meetings. *Id.*

On January 26, 2022, the last Probation report before Jackson's arrest, Probation alleged violations for consuming alcohol and missing two urinalysis tests. Dkt. 77. The Probation Officer wrote that she and Jackson discussed his relapses and missed drug tests

Government's Sentencing Memorandum - 4
*United States v. Jackson* / CR22-037 & CR20-096

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

but "Mr. Jackson lacks reliable transportation and often depends on family members, friends, or Uber." Dkt. 77, at p. 1. The Probation Officer did not know that Jackson bought a car in October that was registered in his name. Notably, the Probation Officer admonished Jackson for his alcohol use shortly before his DUI, but he bluntly dismissed her concerns.

*Jackson's DUI on February 4, 2022*

In February 2022, Jackson was living with his fiancée, Schama Lynce, and his nine-year-old daughter, M.J.. Dkt. 26, p. 5. He was also romantically involved with a woman named Brittney McClain. On February 4, 2022, Jackson picked up McClain and drove her to his mother's birthday party in Renton. Jackson and McClain took shots of alcohol at the party. Whatever McClain drank made her very sick. By the end of the night, she was "on the ground in the bathroom." Dkt. 28, Ex. 7, p. 17. She has no memory of the night between throwing up in the bathroom and waking up in the emergency room early the next morning with a minor head injury.

Jackson drove home from the party around 2:30 a.m., on State Route 167. A 911 caller saw him swerve out of his lane, all over the roadway, nearly hitting other cars before crashing in the center median. The 911 caller stopped her car to check on the driver. She walked to the car and saw a man in the driver's seat. She was 100% sure she saw a man in the driver's seat. Dkt. 28, Ex. 8, pp. 2, 4. The 911 caller left the scene when Washington State Patrol communications told her that a trooper was on the way.

After the crash, Jackson climbed over the guardrail, crossed several lanes of State Route 167 to get to the shoulder, and then crossed the highway again to get back to his car. He also pulled McClain out of the car. Dkt. 28, Ex. 7, p. 6; Dkt. 28, Ex. 8, p. 8. When the Washington State Patrol trooper arrived at the scene, McClain was sitting in the driver's seat. She was barely conscious and mostly unresponsive. She claimed to have been driving, but the trooper noticed that McClain's feet barely reached the driver's pedals and the driver's seat appeared to be sized for a taller person. Dkt. 28, Ex. 8, p. 2.

Government's Sentencing Memorandum - 5
*United States v. Jackson* / CR22-037 & CR20-096

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Jackson eventually admitted that he had been driving the car. The trooper placed
2   Jackson under arrest for DUI, driving with a suspended license, and driving without an
3   ignition interlock device. Dkt. 28, Ex. 8, p. 2-3.
4   From jail, Jackson had video visits with McClain in which he told her that she
5   needed to "go over there in the morning and take care of that for me." Jackson said, "Do
6   not leave there without it and when you get it keep it with you and don't touch it . . . .
7   Make sure you put it somewhere safe out of reach and don't touch it until I come home."
8   They assiduously avoided discussing what "it" was. In other video visits, McClain called
9   Jackson from the highway, where she was looking for the crash scene.
10  During one of their calls, McClain noted that she and Jackson could have died in
11  the February collision. Then they argued about Jackson's relationship with Lynce.
12  Jackson told McClain (emphatically) that he was not involved with Lynce, and that if
13  Lynce said anything to the contrary, she was lying. This was identical to the situation
14  after Jackson's arrest in 2019, when he told two different women that he was not
15  romantically involved with the other woman.
16  In another jail call, Jackson blamed his Probation Officer for his situation, telling a
17  friend that he was put in jail by "the same PO that uh -- that keeps f---ing with him." Dkt.
18  28, Ex. 7, p. 15. Jackson asked the same friend to retrieve an item for him, but, once
19  again, was intentionally vague about what that item was:

Government's Sentencing Memorandum - 6
United States v. Jackson  / CR22-037 & CR20-096

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

```
MR. JACKSON: But Brittney -- Brittney knows -- you
know, Brittney knows where the tow company is and where
that shit's at, you feel me? So she'll be able to tell you
exactly where it's at. And Sharma will be able to tell you
exactly what needs to be grabbed.
    UNKNOWN MALE SPEAKER: Okay. Say no more. It's
gravy.
    MR. JACKSON: Yeah. Remember when, uh, me, you and
Sharma was sitting at the little -- we was taking pictures
that one day, and, uh -- before me and Sharma was getting
ready to leave. And, uh, you know, me and Sip (phonetic)
was, you know, handling some shit.
    UNKNOWN MALE SPEAKER: Yeah.
    MR. JACKSON: Yeah, I need you to go get that, too.
    UNKNOWN MALE SPEAKER: Okay. (Inaudible).
```

Dkt. 28, Ex. 7, p. 9.

  Several days after Jackson's arrest, a Washington State Patrol Trooper located a Glock pistol with an extended capacity magazine in the tall grass on the shoulder of State Route 167. This area was directly across the highway from where Jackson had crashed his car, and the same area where Jackson had been observed crossing the highway on the night of the crash. The pistol was inside a small black bag. The bag contained several documents in Jackson's name and an identification tag for Jackson's car. Ex. 1. Jackson's possession of this pistol triggered new supervised release violations and a new indictment.

  While in jail, Jackson continued blaming his Probation Officers for his legal troubles. He and his mother had extensive discussions about contacting McClain, whether McClain would provide evidence against him, and how they would get her a lawyer. Jackson said he told McClain, "[T]hey can't put you in jail . . . for not showing up to a subpoena."

Government's Sentencing Memorandum - 7
United States v. Jackson / CR22-037 & CR20-096

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

During pretrial litigation, Jackson filed a sworn declaration from his alleged fiancée (Lynce) in which Lynce claimed the gun was hers, that Jackson did not know it was in the car, and that Jackson "never would have risked losing his daughter by carrying a gun." Dkt. 27, Ex. 1. She later retracted that story and claimed that Jackson carried the gun regularly to protect himself. Dkt. 58, Ex. 1.

## II.    SENTENCING GUIDELINES

Jackson has 20 criminal history points, which places him in Criminal History Category VI. PSR ¶ 37. His total offense level is 17, and his Sentencing Guidelines range is 51 months to 63 months. PSR ¶¶ 22, 82.

Jackson's possession of a firearm is also a Grade B supervised release violation that carries a Guidelines range of 21 months to 27 months. U.S.S.G. § 7B1.4. The maximum term of imprisonment that can be imposed for supervised release revocation is 24 months. 18 U.S.C. § 3583(e)(3).

## III.    GOVERNMENT'S RECOMMENDATION

With his mental health history, substance abuse history, criminal history, and history of issues with women—combined with the stress of being a single parent *and* the challenges of parenting after surviving an abusive childhood—Jackson's possession of a firearm is an absolute nightmare for himself, the people he cares about, and the community. His mistakes were very serious, and the consequences of those mistakes could have been much more serious.

The last time Jackson appeared before the Court for sentencing, he had not had the benefit of comprehensive services to support his recovery and rehabilitation. That is no longer true. Jackson has benefited from mental health counseling, alcohol abuse counseling, sober support groups, parenting classes, and reentry mentors. Neither this vast network of support nor Jackson's strong bond with his daughter were enough to effectuate long-lasting behavioral change or mitigate the risk to the community. Despite making progress in some areas of life, he continued to be deceitful and reckless in others.

Government's Sentencing Memorandum - 8
*United States v. Jackson* / CR22-037 & CR20-096

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

It is fair to say that he still needs more help and more support. But it is not true that help and support alone are sufficient to address all the complex factors contributing to Jackson's destructive behavior.

In the past few years, Jackson has lied quickly, easily, and emphatically. Over time, his conduct has compounded to a point that it is now very difficult to believe him when he says this time is different. As one example, Jackson says he is committed to his daughter's happiness, and, in many ways he has been. But some of his actions, for example, living with a fiancée while dating another woman and lying to both of them, are fundamentally inconsistent with his stated commitment.

No one disputes that Jackson had a traumatic childhood and that he suffers from severe mental health and substance abuse issues rooted in that trauma. Even so, as an adult and a father, he remains responsible for his choices and his actions. He is responsible for lying to his Probation Officer and dismissing his Probation Officer's admonishments about his alcohol use. He is responsible for blaming Probation for his problems rather than owning up to his own shortcomings. He is responsible for concealing the severity of his alcohol addiction. He is responsible for illegally carrying a firearm despite knowing what was at stake. He is responsible for placing his own desires above his daughter's needs and jeopardizing her safety and stability in the process. Jackson's tendency to lie, conceal, and blame others for his poor choices is a major reason he keeps ending up in the same place again and again.

Treatment can and should remain a component of Jackson's sentence. But the Court must also impose a sentence that reflects the many aggravating factors of this offense and Jackson's individual culpability. This is Jackson's third federal crime, and the second federal crime he has committed on supervised release. Even aside from his possession of a firearm, he committed an astounding number of supervised release violations over a 9-month period. As an adult, Jackson has not yet demonstrated that he can live in the community for a year without violating the law. The Court's sentence must

Government's Sentencing Memorandum - 9
United States v. Jackson / CR22-037 & CR20-096

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

impress on Jackson that there are significant consequences for deceiving Probation and endangering the community. Jackson's significant trauma and addiction help explain why he keeps making these mistakes, but neither is an excuse for him to continue making the same mistakes for the rest of his life.

## IV.  CONCLUSION

For the foregoing reasons, the government recommends a sentence of 60 months in custody, followed by 36 months of supervised release. Regarding Jackson's related supervised release violations (CR20-096 RSL), the government asks the Court to impose a sentence of 24 months, concurrent to the new case, and terminate supervision.

DATED this 9th day of June, 2023.

Respectfully submitted,

NICHOLAS W. BROWN
United States Attorney

*/s Jessica M. Manca*
JESSICA M. MANCA
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
Telephone:  (206) 553-4397
Fax:            (206) 553-0882
E-mail:       Jessica.Manca@usdoj.gov

Government's Sentencing Memorandum - 10
*United States v. Jackson* / CR22-037 & CR20-096

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970